Next on our calendar is U.S. v. Alexander. Isn't everyone interested in the next two cases? Why don't you wait a couple minutes? I'm delighted that so many people are interested in the plight of a poor immigrant. Usually when this happens, I say something like, when the 1% leave and we can get back to dealing with the routine business of the court. But that's because usually these big audiences are for massive Wall Street cases, where everybody in the room is getting paid to be there to monitor the argument. They need a couple more minutes. We're going to see pictures of driveways? Excuse me? Are we going to see pictures of driveways now? Sure. I am happy to show pictures. Could you please shut the door back there? All right, Ms. Glashauser. Thank you. Your Honors, at 3 a.m., a police officer with nothing more than a vague hunch walked 84 feet down the side of Mr. Alexander's small Staten Island house to search. The officer skipped the front door, passed the side door, and he kept walking. He didn't have a warrant for that search. He didn't even have reasonable suspicion. This kind of warrantless search of the area immediately surrounding someone's home is exactly what the Fourth Amendment prohibits. Yes, suspicion, but not reasonable suspicion. Exactly, Your Honor. He had some sort of unparticularized hunch. And the question of reasonableness has to do with what he saw on the street. What he saw on the street doesn't, if Your Honor is referring to the... He's not looking inside a house. He's looking at an open driveway, not fenced, except as to the neighbor's property. He's looking up the driveway, and he sees something which causes him to be suspicious. And the question is whether that's reasonable. I would disagree with that formulation, Your Honor. He doesn't see the area that he is searching from the street. This is not a plain view situation. No, he does. He sees his driveway. And in the driveway, he sees what could be a shed, what could be a garage, but another house distinct from the house that is the main house, the residential part. And he sees a part of a backyard, and he sees someone there. Well, that's not quite right, Your Honor. He sees Mr. Alexander standing in front of his property on the front yard. At some point, Mr. Alexander walks to the backyard and comes back. At that point, the officer decides to search Mr. Alexander's property. It's not that he sees something on Mr. Alexander's property to... They saw him drop something. They saw him pick something up, and then they saw him not have that something that he picked up later. They had just conducted an arrest that generated drugs. Mr. Alexander said that those were his cousins and that he was standing out with an open container just drinking. And then he kind of proceeded to move. He announced that he's leaving. Not exactly clear to me what he said and what he was referring to, the container or something else. They see him pick up another bag and walk to the back. That's right. The facts about whether it was an open container or not, if he was on public property or private property, are not clear. It doesn't matter. If the officers wanted to ask him questions relating to the drug arrest, they could have done so. What they saw was he picked up a bag and moved it from one part of his property to another part of his property. Is that fair to say? That is correct. And the government does not contend that there was a reasonable suspicion. I'm wondering if that's because it doesn't make a difference whether it's a reasonable suspicion. That is to say, your contention is this is a search that requires probable cause, and their contention is this doesn't require anything because it's open fields. Right. Our contention is it's a search requiring a warrant, so probable cause and a warrant. And nobody is contending that there's a kind of Terry Slott version of open fields where you're in between the curtilage and the open fields and a reasonable suspicion would do, and this is a reasonable suspicion. No one's saying that. Exactly. So the whole question is what this area is and whether it has any protection at all. And I do think that pictures are helpful as far as open fields. We're talking about this area right here a few feet from a home in Staten Island, and your honors have copies of it at A20. I have extra copies if you would like them. This is just a few steps from his Staten Island home. This isn't an open field, and if you look at the cases about open fields, those make sense. They're about crops. They're about wooded areas. The name open fields, that's what the rubric has become, but I don't think anyone believes that you need to be growing a crop in an open field for it to be non-curtilage. You don't have to come into this house. Felonies don't have to be aggravated. Open fields don't have to be open and they don't have to be fields. Right. They could be woods. They can be unoccupied, abandoned structures on a property. We're not talking about a farmstead. We're talking about what goes on in the city of New York. Right. And if you want to come into this house, you go up the driveway and you see a door in the middle of the side, and you go in there and that's how you get into the house. Lots of people don't enter through the front door anymore. They enter through the side door near the kitchen. Specifically in this case, the testimony is that the entrance is the front door. You can't see the side door from the street, but putting that all aside. I'm looking at a picture on page 4 of the appellant brief. Sorry, is it a side door or a back door? I understood it was an entrance from the backyard, not at the end of the driveway as opposed to in the middle of the driveway. I think that the helpful diagram for where the door is is on A22 of the appendix, and you can see the front door, which is at the front. The side door is somewhere down the driveway, but still before the spot that is searched. Oh, it is. And there's no dispute that the officer here is not going to the doors. He passes both doors. And again, even that, even if it were by the side door, wouldn't save this case, because in Jardin, we know that even if officers are going in a regularly accessible place where the public might go, it doesn't matter if they're going there to conduct a search. I'm not sure I see the side door in any of the photographs on A1921, and I don't see that the side door is marked on the diagram that you mentioned on A22. So I'm a little puzzled about where the side door might be. The side door is the area where the house, which is orange, has a little divot. That's where the side door is. Indentation. The indentation, yes. The searched area is the area that's past the driveway area. So that's why it isn't visible from the street, and isn't even visible in the sort of side view photographs of the house on A18 and A19, because it's in that divot. Exactly. What a patch 4, Judge Lynch, I think shows the side door. It's not very distinct. No, I think it doesn't. Or is the side door the part, if you look at your own brief at page A4, is the side door that little strip of white where the lower house is? No, it's in front of it. No, I think if you look at the close-up picture in the appendix, you see that's not a door, it's a window. Right. The side door is hidden from the street, which is why the testimony that visitors don't go to the side door makes complete sense here. Either way, the officer was not going to the side door. He wasn't going to approach the property. I'm thinking about how the property works and what one might conclude is curtilage, what one might conclude is not curtilage based on reasonable expectations. Visitors and cases of held accordingly drive into a driveway, and if there's another door there, that's also kind of part of the license to approach a door to the house. It may be that other people typically use the front door, but isn't there maybe a diminished expectation of privacy in an unenclosed driveway, in a driveway to begin with that's short and in which one might park if one were visiting?  First, this is past the driveway, so we'd have a different conversation if the officer searched at the side door. We'd also have a different conversation if the officer was driving in and going to the side door to knock on the door. Jardine makes clear that your purpose, if the officers are there to search, even if they follow the common pathway up a front porch where all the visitors go, that's still not okay if the officers are doing that to search. So if the officers went to the side door to search? Well, in Jardine, they were entitled to go on the porch, and to be on the porch. What they couldn't do was use a dog to sniff inside what was going on. Right, they couldn't conduct a search. Their presence was permissible. And so here, similarly, the presence in an area as to which there's a diminished expectation of privacy because of its openness to the public and customs of usage seem to me, you know, plausible. The presence in an area that is customary to visitors to search is what Jardine says is not allowed. But even if that ‑‑ but this is past the driveway additionally. So that's not the scenario we're in. The officer isn't in the portion of the property that is available to visitors. The officer is past that, and he is searching. And I think I'd like to address the ‑‑ But you're saying as a factual matter, where this bag was that was located and looked into, that is past the area to which a visitor who was going to the side door would go. And that would be your response to whether the officer was somehow licensed to do this, do what he did. But you're also saying that as a matter of curtilage, what in ‑‑ if the first question is, is this curtilage or not, the fact that someone would go there or might be ‑‑ an ordinary visitor might be licensed, you know, your friend, your ‑‑ the Jehovah's Witness, the fuller brush man who goes to the door. In Jardines, it's still curtilage. The porch in Jardines is still curtilage. That's the first thing. Even though people might be licensed to go up on it to ring the doorbell, but they wouldn't be licensed to look under the seats of the porch swing to search for what might be there. That's right. Is that your understanding of the Jardines case? Yes. Okay. Yes, definitely. And I think that raises an important issue that Your Honor was asking about visibility. Homes have windows. That doesn't mean they don't have Fourth Amendment protection. Just because you can see that there is a shed doesn't mean that officers can go 84 feet down the drive and search in front of that shed. They can't go to the shed. What happens if they see something to the side of the shed? Right. No fence. No fence. That's right. There's no fence. That's not something that's required. It's open. We don't have to fence in our property. I was having a catch in the driveway and the ball went beyond me into the yard. No obstruction. I just go in and get the ball. Sure. On your property you can play catch and go get the ball. Anybody buys property. Should we be focusing on where the officer is or where the bag was? Where the bag was, Your Honor. And the bag is in an area that is protected. But you would agree that if what the officer saw from the street in front of the shed was a big pile of white powder with a sign on it that said cocaine, that the officer then would have a plain view of what was there and would have the opportunity to seize that. Would you agree with that? I think what Your Honor is suggesting is then there would be a warrant exception, like destruction of evidence or exigency. Some exigency that would permit the seizure of evidence that was seen in plain view from the street. Right. But that wouldn't change that it was the curtilage that's protected. And here your argument is what they saw from the street, if they could see anything in the dark, was at most a bag. There was nothing in plain view about that bag that said, that's obviously guns, that's obviously contraband, that's obviously evidence. Is that a fair statement of the record? That's correct. I thought the record suggested that there were parts of the gun that were protruding from the bag. Once the officer had gone up and searched the bag. But he couldn't see that from the street, though. No, not from the street. Right. Once the officer had already gone back to conduct his search, that was his testimony. So conceivably, if there was a bag, say it's broad daylight, and from the street the officer could see the barrel of a machine gun poking out of the bag, the officer, well, I'm not going to ask you to say he would, might have had the right to go and seize that at that point. He might have, under exigency. But that's not this case. That's correct. Because from the street, all that was seen was something that the officer said, I'd like to search that. And then he went back, and when he got back to do his search, at that point, his testimony is he could see the barrel of the gun or some part of the gun protruding. That's right. Your argument is he shouldn't have gone there to do that. Exactly. So would he have been entitled to stand in the street, for example, if there were no cars there, and shine a light back looking around to see what Mr. Alexander had dropped? And if he were able to, with the assistance of a lamp in the middle of the night, able to see the bag with guns sticking out, would he be entitled then to go and retrieve the bag? I think he would be entitled to write that on his warrant application and freeze the property. That's not an exigent circumstance. And this court— What are the chances are that it would be there when he came back? If he froze the property, I would say fairly high. But this court has made clear that just a gun or being in a high-crime neighborhood is an exigency. So even in that scenario, if they had seen this from the street, which they didn't, they can't just walk onto your property. And what the government is really arguing here is that if you have a small Staten Island property or any small property where you're not enclosing your property in a fence because it's just really not necessary for everyone to do that, that you have no Fourth Amendment protection in an area a few feet from your home. If we uphold this, and I'll be interested in seeing whether the government would want to distinguish the hypothetical I'm about to propose, the government's proposition is that an officer patrolling the neighborhood could just decide to go back into this man's backyard for no reason at all and poke around and see if there was a bag that might be of interest when he went back there with no basis whatsoever. That's the government's position because it is not enclosed behind a fence and is not curtilage of the house. Is there a distinction, though, in the fact that the officer saw something from the street without any demarcation of property to suggest privacy? Wouldn't a reasonable officer be expected to follow his sights and follow his nose to go and see what was dropped in a circumstance reeking with suspicion? No, Your Honor. A reasonable officer would get a warrant if he had something that he could put in a warrant to explain why he wanted to enter the property. This is a situation where it would be readily apparent to the public that this is private property. This isn't unclear. It's not even cases that this Court has decided where the area is 375 feet from the home can still be protected. It's clear. It's readily apparent that this is an area immediately surrounding his home. And there's also testimony that it's used for activities of the home, like barbecues. It's a chair that's searched. There's a chair sitting there, which certainly supports that the testimony is reasonable, that they hang out there. So would you say that the done factors have been just totally overtaken by events? Done is too old. Jardines really has a different approach. And we shouldn't really attach any weight to whether it was enclosed, the measures taken by Mr. Alexander protect his effects from a view from the street, and the nature of the uses to which the property is put. You're just saying that this, in this neighborhood, should be deemed curtilage, all pertinent to the home and the sense of privacy around a home, and therefore protected from any entry except under exigent circumstances or with a warrant. What you're saying is correct, but the done factors can still be used. They were always meant to be a helpful guide for determining whether things are curtilage when it's not clear. Here, the first done factor is proximity, and that is overwhelmingly in favor of finding that it's protected here. And the other thing that supports that is the uses, and the district court finds that it's occasionally used recreationally. Those two factors are enough. The other two factors are really about visibility. And I think that this court's decision- What is enclosure and what is visibility? And I see them as somewhat different. I'll address both of them, Your Honor. In Riley, where this court discussed the done factors at length, the court mentioned how enclosure is really useful when we have layers of fencing. And that's the same thing that Dunn said. When somebody is indicating with a fence, this is the area of my home, and then they have another fence around a different area of their property, enclosure can be useful. In Riley, the court said it's not that useful because that property didn't have those layers of fencing, even though it was quite large. The court talked about how it was readily apparent that this was the area that was part of the homestead, even though in Riley it was 375 feet away. And that's the same thing with observation in this kind of situation. You don't lose your Fourth Amendment just because you can see that there is an area back there, just like you don't lose your Fourth Amendment in your home because you have windows. Very good. Thank you very much. Thank you. We'll hear from the government. Mr. Gilman. Good morning. May it please the Court. My name is Andrew Gilman, and I represent the United States. Your Honors, the district court properly denied the defendant's motion to suppress two semi-automatic firearms found on the top of the defendant's unenclosed, publicly accessible, and viewable driveway. So it would be influenced by firearms? Excuse me, Your Honor. Influenced by where the bag was that contained the firearms? Yes, Your Honor. That is an important part of the analysis. Firearms are what was found. The question is whether what was found was done in a reasonable search. That's correct, Your Honor. Firearms are intent to load the question to make it unreasonable for us to grant the suppression. Simply recognizing what they were that the government found. Maybe we should focus on what's true. Yeah, let's talk about the issue. Is it the government's position that if an officer on patrol is walking down this street, the officer has every right to treat this area of the backyard of this house as part of his patrol? That is not the government's position, Your Honor. Well, tell me why it isn't. The backyard, Your Honor, is entirely distinct from the driveway here, which we're focused on. Well, wait. This is the grass beyond the driveway, right? That's incorrect, Your Honor. The district court made a factual finding, subject to clearly erroneous review, that was adequately supported by the record, that the gun was found, the guns, plural, were found on the top of the driveway, on top of a plastic chair, in front of the shed. Page 8 of the, is this approximately what we're talking about? So there's concrete in front of this shed that the driveway leads to. I think it's most helpful. That's correct, Your Honor. So if the chair was on the grass, it would be different? I think the analysis is still the same there because . . . So any part of this, so the officer walking down the street in front of the house would be entitled, as part of his patrol, to walk up the driveway and walk to this back fence and see what he saw? Not to that back fence, Your Honor. Why not? That's not the record here. Why not? Your Honor, the driveway itself constitutes an open field, as the Supreme Court has used that term, because it's not within the house's curtilage, applying the Dunn factors. Why is the grass over here? So he couldn't go to the back fence. He could go up to the shed on this grass patch? He could go right up to where the driveway ends at the shed where the gun was found. The testimony specifically . . . So he could walk over here. What distinguishes the driveway from the area leading to the back fence? Putting aside for a moment what is literally behind the house that could not be seen from a front-on view, are you saying that why isn't all of this an open field? It's not fenced, right? There's nothing that prevents the officer from seeing it. The officer, as part of his patrol, you're saying at a minimum, is entitled, just as he was on the street, to walk up here and peer into the shed if the door is open, and if he sees something incriminating, he can get it, right? Because he would be where he has a right to be as part of his routine patrol without any suspicion leading him to go there. That's correct, Your Honor, and I would direct the Court to Judge Lynch, your own opinion, in United States v. Allen, which was post-Jardins, which recognized that when a police officer enters private property for a legitimate law enforcement purpose and embarks only upon places visitors could be expected to go, observations made from such vantage points are not covered by the Fourth Amendment. Right, but I agree that once he's there, if you say that he's entitled as part of his patrol to walk into this area, anything he sees is fair game. Agreed, right? That's correct. So if we say that this is not part of the cartilage, then an officer is entitled as part of his routine patrol, not confined to the sidewalk, can simply, because he's interested in this person who lives in this house, to walk all the way back to this shed, look into the shed if the door is open, look around the back of the house and see if there's anything in that backyard that might be evidence, because it's just part of his routine patrol. It is an open field. It is equivalent to the sidewalk. Is that the government's position or is it not? That's not the government's position, Your Honor. Explain why. Why is this case different than that? This case is different because, well, first to direct your specific hypothetical, to address that hypothetical, if the officer was on the driveway, which the government argues is not the cartilage, and saw something in the backyard close to the house, that typically, as the district court properly recognized here with respect to the bottle the defendant had, is part of the house's cartilage, and he would not be authorized to go into that backyard and seize that cartilage. I think what would be... Not if there was some obviously contraband material in plain view? It would then, I think he would, there would need to be perhaps an exigency to justify him entering the property to seize that item. He has the option of freezing the scene and applying for a warrant. My point is, your position is that an officer on routine patrol can treat anything that can be seen up to the level of the driveway and the end of the concrete there as part of his patrol. The officer is perfectly entitled, just as he is on the sidewalk, to walk up there for any reason or no reason at all onto that piece of property. That's correct, Your Honor, and that holding is consistent with the myriad of cases in this circuit and others finding that driveways typically fall outside of the house's cartilage. You have to take that absolute position. What about seeing something from the sidewalk that arouses suspicion? Is an officer not entitled to follow a suspicion outside a house and not yet rising to the point of reasonableness? In other words, he sees something that looks bad in the context of everything that was going on up to then. Can't he follow his nose? There are circumstances when he can follow his nose. As we know from Jardins, he's... Are these they? Sorry? Are these such circumstances? These are those circumstances, Your Honor, because the guns here were in the driveway outside of the cartilage. He doesn't know they're guns. If they were guns, it would not be a problem. He doesn't know what they are. He just thinks they're suspicious. That's right. He can enter an open field to make that trespass. Let me ask you about that, though, because the testimony suggests to me that the officer was right next to where he found the bottle, which was behind the house and which the court found was within the cartilage, was right next to the house, within a foot maybe, and that he's standing there. He then decides to use his flashlight and look around and makes a circle sweep. So he's within the cartilage of the house. He is right next to the house is what he says. I went to where the bottle was, he says, and then my flashlight. I did a radius circle check of the area to see the bag. And so what did you see? I saw a black bag on top of the chair. It seemed to be the same bag. This was my flashlight. Right over here, I went to where the bottle was, and then I stepped over it and went like a circle. So he is right next to the house. He's not at the top of the driveway. He is not in the area that you claim is public area, even, were we to go down that path. He is elsewhere, and that was the source of my question earlier about what do we focus on, where the officer is, which seems to be the nature of the intrusion, rather than where the thing found was. Yes, Your Honor. Could you address that concern? I will. To distinguish the bottle from the firearms, the bottle was specifically in the backyard, which is part of the curtilage. So that's where he was, in the curtilage? When he found the bottle. But when he found the guns, which were in the top of the driveway, that was outside the curtilage. But he found it because, standing in the curtilage, he takes his flashlight and then proceeds to look all around in the backyard and over to the driveway. So you're saying it doesn't matter where he was. It matters just where the bag was. Is that right? Both are important factors, I think, in determining the appropriateness. The officer needs to be in a position where he is constitutionally permitted to be. If he's within, say, the license of approaching a porch and he's on the porch, Jardin says he can't search there with a dog. But, of course, any man is allowed to knock on another store, and if he sees something plainly contraband, in plain view, when he's on the porch, he's in a position to seize that. And so both are important. It occurs to me that the officer from the sidewalk sees something that causes him to go up the alleyway. And then at the alleyway, he does a search, and there's no division line, so he walks into the back of the house to see better. And at that point, he does a sweep and sees, we don't know exactly where, but some bag that arouses his suspicion. So he's in an area that he came onto only because he was suspicious. And because he's suspicious, he's going into an area that may be neither curtilage nor open property or open fields. Open fields is very hard to deal with in Staten Island. We have a public sidewalk. We have an alleyway that people go into with some frequency. And we have an area beyond that is open, not marked, and the officer goes there because of a suspicion. Is there some category between the two? I'm not aware of a category between the two. The Supreme Court in Jardins even recognized the continuing viability of open fields. It's either one or the other. That's right. That's my position. There are areas in New York City that are neither. Well, open field, Your Honor, neither. Anyone that lives in a semi-detached area has an area where there are people that come into. And it's like a stoop. You sit on a stoop and drink some beer with friends or play dominoes with friends. The stoop might just as well be in the back of the alleyway, which it often is. And is it an open field? An open field, as the Supreme Court has recognized, need not be open nor a field. It's just a terminology for the doctrine for the area that's not the curtilage. So the result is, though, I mean, you know, whatever the ironies of the terminology, the government's position is there are two things that any space outside the physical walls of a house can be. One of them is curtilage, and a search of the curtilage requires probable cause and a warrant. And the rest, whether you call it open fields or something else, is fair game, and there need be no probable cause and there need be no reasonable suspicion, right? That's correct, Your Honor. And the government has not contended that there was a reasonable suspicion here. Maybe it should have or could have or maybe we might think that. But as I read your brief, I did not see any argument that this was okay because there was a reasonable suspicion. I believe that's correct. You're saying it's okay regardless. If it's just a hunch, if it's not even a rise to the level of a hunch, as I was saying before, it would be perfectly okay for the officer to treat as part of his regular rounds, going up every driveway of every house on the street that looked more or less like this. The police can't abuse their authority, Your Honor. What would make it an abuse? You're saying there is no legal requirement for any reasonable suspicion or probable cause or any other basis because it is an open field. I recognize that the fact that it's not a field is not germane, but it is an area that is available to routine police intrusion because there is no legal doctrine that gives any expectation of privacy whatsoever, even one protected only to the level of Terry Stott-style reasonable suspicion. That's the government's position. The officers can't be on like an ultra-vires mission to violate the law, but provided they're on for a legitimate— I'm not saying it's ultra-vires. They're not going there to meet a prostitute. They're going there because it's part of their routine patrol to look and see if there's something in the neighborhood, just like on the sidewalk. We're kind of fencing about something that we're trying to put you into categories. I would suggest that an officer who went up every driveway just as a matter of routine would not be acting reasonably within the city of New York, but that an officer who saw something from the street and there were no fence and there was no cartilage per se would not be a good officer if he didn't act according to his suspicion and go into this sort of semi-open area. I would consider that entry to that property to be a legitimate law enforcement purpose. But I don't know what the category is. Because if he went in there as a matter of right, we would all think that, no, this shouldn't be done. But if he didn't go in because he had a suspicion, because he was afraid it was cartilage, we would say he was acting too precautiously. I think that's right. And I don't know what category my own hypothetical believes me to. Well, maybe we could create one and say there's something that requires a reasonable suspicion, but the government has not argued that the suspicion was reasonable, which is normally the prerequisite to something less than a probable cause search, and the district court did not make any finding that there was a reasonable suspicion because that wasn't the argument, right? That's right, Your Honor. And I think the case law is clear that this, quote-unquote, trespass is allowed in an open field when the officer is on a legitimate law enforcement purpose, conducting an investigation, and in a cartilage as determined by the appropriate analysis under- I'm sorry. I'm sorry. You're saying it's an open field or a- I misspoke, Your Honor. I apologize. When the officer is conducting an investigation in an open field- And you're saying driveways are per se open fields? No, not per se, Your Honor. It's a fact-dependent test that is guided by the- that is controlled by the factors and recognized in United States v. Dunn, the appropriate test to determine whether an area of a property is within the cartilage or not, even after the district court's decision in Jardins. This one is not protected because this isn't a rich guy who has a gate on his driveway. If he had a gate on his driveway and the officer saw the same things going on inside the gate,  Is that the government's- He doesn't need to be rich to have a gate. I would agree with Judge- This guy doesn't look too rich from the property. No, but his neighbor had a gate. I would agree with Judge Hellerstein, Your Honor, that it is practicable for the defendant. It is possible for him to be able to enclose that area such that he would create a reasonable expectation of privacy for himself under the Dunn factors. Are you saying they have to be- I would distinguish between enclosure and visibility. I mean, this was enclosed in large part, but it's a hurricane fence. You could see across it. And so they're different. It's an assertion of property rights, but maybe not of the same level of privacy as it would be if everything was behind a- if the fence were not transparent. I think that's right, Your Honor. Both factors are parts of the Dunn analysis. Proximity of the area claimed to be cartilage to the home. It's proximate. Two, whether the area is included within an enclosure surrounding the home. Well, it's got a fence dividing the property, and we don't really know, but it doesn't seem to be a division from the street in this house. Three, the nature of the uses to which the area is put. It's an open driveway. Four, the steps taken by the resident to protect the area from observation by people passing by. Parts of it can be seen. Parts of it can't be seen. The part where the officer went can't be seen, but he came from an area where he could be seen. The Dunn factors don't seem to help very much here. I think they do, Your Honor. Those factors that you just mentioned all militate in favor of the district court's finding that the gun was not within the cartilage. It's an open, publicly accessible portion of this driveway, a driveway which delivery men, visitors are permitted to drive up and use to enter the house. That type of area of a household typically falls outside the cartilage. Except if it's a front porch. A front porch would be an entirely different animal, Your Honor. Even though people go up on it all the time, it still was held to be part of the cartilage. But a driveway is different than a porch because... It's the nature of the use in my mind that really distinguishes a driveway and a porch. The porch is much more connected with the intimate activities inside the household, which is really what defines cartilage. The backyard would be, because it's not visible from the street, would be cartilage. I think that's the... And the driveway is not because it's visible like the porch, but is not used... Maybe the grass part is because that's used for barbecues, but they said the concrete was used for barbecues also. So what is it about driveways that's different than porches exactly on the facts of this case? What distinguishes the porch and jardines from this driveway? Because the driveway, the nature, it's really the nature of the use. The nature of the driveway is you can bring a car onto it. The nature of the porch is you can walk on it on your feet. That's a distinction? The intimate activities associated with the porch and the driveway are much different. On the porch there's a swing where Jimmy Stewart and his girlfriend can spoon. When you want to enter the house, you have to go into the porch. It's got different uses. It's got a private relaxation, but it's also an access to get into the house. Except for the side door here, the part of the driveway that the officer went into was not part of what the public would use to go into a house. It was beyond it. Sorry, Your Honor, what was beyond what the public would use? Where the officer went. And the public would not have gone there, except if the public were invited to go. No, the factual finding was that the guns were on top of the driveway. I could go into that driveway. If I went passing by the street and I wanted to go into that driveway, I couldn't go in. It wouldn't be reasonable for me to go in. I'd be a trespasser. If I went into the driveway to look into the backyard, I'd be a trespasser. I think, Your Honor, I disagree. Maybe the officer got there just because of reasonable suspicion. Maybe Judge Lynch has it right when he said that your failure to argue that makes you lose this case. I disagree, Your Honor. The Supreme Court is clear, just as recently as United States v. Jones, that a common trespass is allowed as long as that area trespassed upon by law enforcement is an open field that is outside of a house's curtilage. Unless the private property is a car and you put a GPS device on it, because then the propertiness of the intrusion is suddenly what's totally controlling. The court determined that property, the effect, a car specifically, that determination controlled there. But we're in a different analysis here under United States v. Dunn, which is the appropriate analysis here. And those factors taken together correctly determine that this driveway, consistent with the holding of this circuit, United States v. Hayes, United States v. Reyes, Krauss v. Penny, was outside of the house's curtilage. Thank you, Mr. Gilman. We've kept you well past your time. Ms. Glashouser, you have two minutes of rebuttal. Judge Lynch is correct to worry that what the government is arguing means that police can just walk down people's driveways and into the back and search. Does the analysis depend on the time of day at which the activity occurs? That was a theme in your brief, and I'm troubled by the notion that what is curtilage and what isn't might depend on the time of day. It doesn't, Your Honor. The time of day would only matter if the officer was saying, I was just going up to the front door to knock and ask a couple questions. Then the time of day might matter, because people don't do that in the middle of the night. But for this, no. This is always going to be part of the curtilage. It is at nighttime, and it is in the morning. And I'd like to address Judge Hellerstein's concern about reasonable suspicion and reasonableness of what an officer would do. We don't need a new framework of constitutional law to deal with this. We have the framework. If an officer sees something from the street that gives the officer concern, he can write it down and ask for a warrant. He can freeze the scene, even. But what if he doesn't see something that would be probable cause? Sure. I think Judge Hellerstein's question is, what if there is a reasonable suspicion that might trigger, under other circumstances, under other Fourth Amendment doctrines, some further inquiry or intrusion, but not necessarily something sufficient to get a warrant? Right. That doesn't allow the officer to enter the area of the home and the curtilage. The officer could, in this specific case. Good for a Terry stop. There could be no greater intrusion than to stop someone on the street where he has every right to be and make him answer questions. What more intrusion could there be? So here, this is a little different. This is going into a piece of property that you can see from the street and see if there's something there. Actually, the home is. Not as bad as a Terry stop. I don't want to get into a dispute about which is worse. But the home is one of the areas of the heightened Fourth Amendment protection. Here. The only thing left where you actually have to get a warrant in real life is the home, right? Yes, Your Honor. And here. But what if it's a reasonable. Suppose we entertain, because I'm attracted to Judge Hellerstein's argument that maybe there is something or should be something that's in between. The kind of open field that the officer can just go into without any reasonable suspicion. So long as he's on police business, which is checking to see that there's something if there's something wrong. And curtilage that requires a warrant and probable cause. Are you in a position to argue whether the suspicion was reasonable? Or is it that because this record was not developed on that argument, it's not really something you can deal with? I mean, could you say this is not a reasonable suspicion here? Or would you have to concede that it is a reasonable suspicion based on the evidence here? No, it's not a reasonable suspicion. The officer doesn't give any indication even of what he is suspicious of. He sees a bag and he wonders what's in it. That's what the record shows. He saw, it's the middle of the night. The guy's out on the front drinking and holding an open container, whatever. It's 3 in the morning still. And October, right? It's, I think, two years ago. It's Halloween. And he sees the guy go to the back while they're in the middle of this arrest activity and pick up a bag and move something. Which didn't have to be moved. It wasn't in the way. Nothing was going on that required it to be moved that was obvious at all. And he comes back without the bag or the bottle. That didn't have to happen. One might get a, have some kind of concern raised about why someone, why he took this action. Why is that not maybe enough to be this, in the interim, the reasonable suspicion kind of level of concern that Judge Hellerstein's been discussing? I think it's enough that they can ask Mr. Alexander a question. What did you drop back there? What are you up to? What did you have? They can ask questions. And maybe that would develop into something else. Why did you move something that wasn't in the curtilage into the curtilage? Trying to hide it from us? That might be a tough question. But that's what they can do. And that's not what they did here. And actually, that's not what they did here. And it's, we don't want officers to answer the question about reasonableness. We don't want them just to poke around people's yards and see what they might find on a hunch. We want them to ask a question if they have a legitimate concern. A little more than that. In the midst of a drug arrest, one of the people connected with the people arrested goes to the back. He's comfortably drinking in the front. Now he goes to the back and drops something. Well, you know, he actually is. If you were a police officer, you don't think you, well, I can't go there. I'm not allowed to go and see what happened. Well, I hope as a police officer I would have been instructed that I need something more than a hunch to go onto someone's yard. And here, just as far as what they might be concerned about, Mr. Alexander explains what he did. He says, I went and left the bottle out of respect for you. Very good. Thank you very much. Thank you. We'll reserve decision. We'll take a brief break. Five minutes.